**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

GARRETH MURRELL, TEVIN BROWN,        :
KENNETH SAPP, RAOUL GERDES, CHEVON   :    Civil Action No.:
RILEY and SHADDON BESWICK, on behalf of :
themselves and all similarly-situated employees, :
                                     :    **CLASS ACTION COMPLAINT**
                     Plaintiffs,     :
                                     :
           v.                        :    **Jury Trial Demanded**
                                     :
PRO CUSTOM SOLAR LLC d/b/a MOMENTUM  :
SOLAR, JESSICA ADAMS, RAJAN          :
SILBERMAN and ADAM MURAWSKI, in their :
individual and professional capacities, :
                                     :
                     Defendants.     :
-------------------------------------------------------------X

## PRELIMINARY STATEMENT

1.     Pro Custom Solar LLC d/b/a Momentum Solar ("Momentum" or the

"Company") is one of the nation's most successful and fastest growing clean energy companies.

It was recently ranked as the "#2" energy company in the nation, as well as the top company in

New Jersey across all industries.  In just under a decade, the company has grown from two

employees to over 1,200.  The $100mm+ in revenue per year company has operations in New

York, New Jersey, Florida, Texas, California, Pennsylvania and Connecticut.  Last year, New

Jersey provided Momentum with a $7,200,000 tax credit and the investment firm Advantage

Capital recently invested $4,100,000 in Momentum.

2.     What Momentum's investors and clients and the tax payers who help foot the bill

for its operations do not know is that the management at the Company's New York-based

warehouse fostered a work environment permeated with vile racism.  By way of example only:

- Foreman and Defendant Adam Murawski regularly used the word "**nigger**" in front of and directed towards Black employees, including Plaintiffs.

- Defendant Murawski often remarked that work on a project that did not go as planned had been "**nigger'd up**."

- On one occasion when criticizing a project, Defendant Murawski stated to Plaintiff Garreth Murrell, who is Black, "**This [project] is a clusterfuck.  It is a nigger like you**."

- Another foreman named Tom also regularly directed the term "**nigger**" towards Plaintiff Tevin Brown, who is Black.

- Defendant Murawski routinely referred to Mr. Brown as "**boy**," a patently racist term historically used to demean Black persons and "put them in their place."

- Other white employees commonly spoke racist "jokes" and engaged in other racist innuendo, such as **mocking the manner in which Jamaican employees spoke English** and questioning whether Black employees could "afford" to buy certain clothing, **implying that Black persons are universally poorer than white persons**.

- Plaintiff Kenneth Sapp, who is Black, heard Defendant Murawski refer to a broken table as "**nigger'd**."

- Mr. Sapp also heard Defendant Murawski refer to himself, another white employee, and Mr. Sapp as "**two and a half people**," **a despicable (albeit mathematically incorrect) allusion to the so-called "three-fifths compromise"** between Southern and Northern states during the slavery era, which set the census value of a slave as 60 percent of the value of a free person.

- The crew that Plaintiff Raoul Gerdes worked for, which was comprised predominantly of Black employees, was constantly referred to as the "**nigga crew**" by Defendant Murawski.

- Defendant Rajan Silberman, who ran the operations of the New York warehouse, also referred to Mr. Gerdes crew as "**the nigga crew**," as did two white foreman named Jeff and Tom.

- When Plaintiff Shaddon Beswick, who is Black, objected to Defendant Murawski's use of the term "boy," Defendant

Murawski responded, "**I don't give a fuck about how a nigger thinks**."

• The bumper sticker on the vehicle that Mr. Murawski drove to Momentum each day stated, in sum and substance, "**This is OUR America – Get the Fuck Out!**" which obviously sends a threatening message to minority employees.

3.       As if the racist hostility were not bad enough, Momentum also pays its Black employees far less than similarly-situated white employees, ostracizes Black employees, assigns Black employees to the least desirable jobs and fails to provide Black employees with opportunities for advancement.

4.       The racially hostile work environment described herein should come as no surprise given the attitudes of Momentum's New York management towards Black people and employees who complain about racism.  By way of example only, from approximately December 2017 to April 2018, Defendant Silberman, who is white and Indian, ran the operations of the New York warehouse.  As described herein, Defendant Silberman fired Mr. Brown and Mr. Gerdes (both just after they complained of discrimination).  Defendant Silberman has posted the following on his Facebook account:



 

5.     Defendant Silberman was replaced as head of operations for the New York warehouse by Defendant Jessica Adams.  Defendant Adams, who shares a child with Defendant Silberman, also fostered a discriminatory and retaliatory environment, including by terminating any Black employee who dared complain about racism at Momentum.

6.     By way of example only, in or around October 2018, Mr. Murrell complained to Defendant Adams about Defendant Murawski's use of the "n-word."  Mr. Murawski was present for this meeting, ***which was recorded***.  During the meeting, Mr. Murawski admitted to using the "n-word" on multiple occasions, but neither Mr. Adams nor Momentum took any action whatsoever against Defendant Murawski.  Emboldened, Mr. Murawski later joked to his white colleagues, "can you believe he [Mr. Murrell] thought he could make a complaint against me?"

7.     Following this complaint, Mr. Murrell was subjected to increased discriminatory harassment and retaliation.  He complained to Defendant Adams again.  During this conversation, which also was recorded, Mr. Murrell stated:

> So, Jess, you're telling me I'm supposed to be comfortable, right. With you being comfortable with a foreman here calling black people niggers, and that's comfortable for you.  It's not comfortable for me.

8.     Ms. Adams explained that Mr. Murrell was supposed to have been "fired" the day that he initially complained about the use of the "n-word" (*i.e.*, that the company had decided to fire him for complaining), but that Ms. Adams "saved [his] job."

9.     Indeed, when Mr. Murrell pointed out that he had previously approached Ms. Adams about this racist comment, she responded:

> And I handled the situation.  **I almost fired you, I kept your job. That was a mistake right there.  <u>That was my mistake because we're still here having this conversation.</u>**

10.    Put another way, Ms. Adams admitted that, in retrospect, she should have just fired Mr. Murrell when he complained about the use of the "n-word" so that she would not have to hear him continue to complain about discrimination any longer.

11.    **The very next day, Defendant Adams fired Mr. Murrell.**

12.    Defendant Adams fired Mr. Sapp just weeks after he complained about Mr. Murawski's discriminatory conduct.

13.    Defendant Adams fired Plaintiff Chevon Riley shortly after he complained about Momentum's discriminatory pay practices.

14.    Defendant Adams fired Mr. Beswick one day after he complained about the use of racial slurs at Momentum.

15.    As a result of Defendants' discriminatory and retaliatory conduct, there are now only two Black employees out of the approximately 40 individuals who work out of the New York office as foremen and installers.  None of the foremen are Black.

16.    Finally, in addition to racist conduct, Momentum has engaged in blatant violations of the federal and state wage and hour laws, including requiring employees to work off-the-clock without pay and failing to reimburse employees for the costs of tools needed to perform their job.

17.    The unlawful discrimination and retaliation described here was committed in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), the New York State Human Rights Law, New York Executive Law §§ 290 *et seq*. (the "NYSHRL") and the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107 *et seq*. (the "NYCHRL").

18.     The unlawful wage and hour practices described herein were committed in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

19.     Accordingly, Plaintiffs bring this action on behalf of themselves and the members of the "Proposed Discrimination/Retaliation Class," the "Proposed NYLL Class" and the "Proposed FLSA Collective," all as defined herein.

## JURISDICTION AND VENUE

20.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under § 1981 and the FLSA.  The Court has supplemental jurisdiction over Plaintiffs' related state and local law claims pursuant to 28 U.S.C. § 1367(a).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including certain of the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

22.     Plaintiff Garreth Murrell is a Black adult male and resident of the State of New York and resides in Kings County.  At all relevant times, Mr. Murrell met the definition of an "employee" under all applicable statutes.

23.     Plaintiff Tevin Brown is a Black adult male and resident of the State of New York and resides in Queens County.  At all relevant times, Mr. Brown met the definition of an "employee" under all applicable statutes.

24.     Plaintiff Kenneth Sapp is a Black adult male and resident of the State of New York and resides in Queens County.  At all relevant times, Mr. Sapp met the definition of an "employee" under all applicable statutes.

25. Plaintiff Raoul Gerdes is a Black adult male and resident of the State of New York and resides in Nassau County.  At all relevant times, Mr. Gerdes met the definition of an "employee" under all applicable statutes.

26. Plaintiff Chevon Riley is a Black adult male and resident of the State of New York and resides in Dutchess County.  At all relevant times, Mr. Riley met the definition of an "employee" under all applicable statutes.

27. Plaintiff Shaddon Beswick is a Black adult male and resident of the State of New York and resides in Nassau County.  At all relevant times, Mr. Beswick met the definition of an "employee" under all applicable statutes.

28. Defendant Pro Custom Solar LLC d/b/a Momentum Solar is a New Jersey limited liability company that conducts business in, *inter alia*, New York State and New York City.  In New York State, Momentum's principal place of business is located at 45 Fairchild Avenue, Suite B, Plainview, NY 11803.  At all relevant times, Pro Custom Solar LLC d/b/a Momentum Solar met the definition of an "employer" under all applicable statutes.

29. Defendant Jessica Adams is a former General Manager/Installation Manager at Momentum, who oversaw Momentum's New York operations, including the Installation Department in which Plaintiffs worked, and had the authority and ability to control and alter the terms and conditions of all employees who worked in the Installation Department.  Upon information and belief, Ms. Adams resides in Nassau County, New York.

30. Defendant Rajan Silberman is a current employee of Momentum Solar and a former General Manager/Installation Manager at Momentum (he immediately preceded Defendant Adams in this role, who served as his Assistant Manager), who oversaw Momentum's New York operations, including the Installation Department in which Plaintiffs worked, and had

the authority and ability to control and alter the terms and conditions of all employees who worked in the Installation Department.  Upon information and belief, Mr. Silberman resides in Nassau County, New York.

31.     Defendant Adam Murawski is a former foreman at Momentum who managed and/or worked with Plaintiffs.  Upon information and belief, Mr. Murawski resides in Suffolk County, New York.

## PROCEDURAL REQUIREMENTS

32.     Shortly after the filing of this Complaint, Plaintiff Murrell will file a charge of discrimination, arising out of the facts described herein, with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  When the EEOC completes its investigation of the charge and issues Plaintiff Murrell a notice of right to sue, Plaintiffs will seek leave to amend this Complaint to add claims for Momentum's violations of Title VII.

33.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

34.     Any and all other prerequisites to the filing of this suit have been, and with the filing of the EEOC charge will be, met.

## FACTUAL ALLEGATIONS SPECIFIC TO INDIVIDUAL PLAINTIFFS

**I.**     **Garreth Murrell**

    **A.**     **Mr. Murrell Is Subjected to Disparate Working Conditions and Pay Because of His Race**

35.     Garreth Murrell worked at Momentum from in or around August 2017 to November 2018.  Mr. Murrell worked in the Installation Department, which was responsible for traveling to Momentum customers and installing solar paneling on their homes.

36.     As Ms. Adams and other managers at Momentum have repeatedly acknowledged, Mr. Murrell was a strong performer and a unique asset because he possessed expertise in both solar panel installation and electrical work.

37.     This skillset helped Mr. Murrell earn a promotion to foreman (despite the objections from the other foremen, all six of whom were white, as well as objections from other white managers) in or around January 2018.

38.     However, Mr. Murrell was subjected to far less favorable terms and conditions of employment than his white peers.

39.     For instance, the vast majority of projects Momentum assigned to Mr. Murrell were New York City-based, which were notorious for being significantly more difficult than projects based in Long Island because of, *inter alia*, the significant travel time, difficulty finding adequate parking, and prolonged workdays and increased pressure to complete hard jobs in a short time.

40.     In comparison, Momentum permitted white foremen to choose which assignments to take on (and they would usually choose Long Island-based household installations).  White foremen routinely complained about New York City-based projects, which would invariably be given to Mr. Murrell.

41.     In addition, while other foremen typically had five or more crew members, Mr. Murrell would routinely be provided with only three or fewer crew members, despite his projects being larger in scale and more complicated.

42.     Mr. Murrell, like other Black employees, was also shamelessly paid less than his white counterparts.

43.     After Mr. Murrell's many strained attempts at receiving a fairer, more commensurate wage, Momentum raised Mr. Murrell's hourly wage by a mere dollar.

**B.     Mr. Murrell Complains About Mr. Murawski's Use of the "N-Word"**

44.     In mid-October 2018, while at a job site, a white foreman named Adam Murawski suddenly said, while Mr. Murrell was in the vicinity, "This [project] is a clusterfuck.  It is a nigger like you."

45.     Mr. Murrell, shocked at what he heard, immediately asked Mr. Murawski to clarify what he had said.

46.     In response, Mr. Murawski defiantly repeated the same vile comment and laughed.

47.     Later that day, a Black member of Mr. Murawski's crew named Antoine told Mr. Murrell about how Mr. Murawski constantly made similar vile and despicably racist comments in front of him, such as his use of the term "nigger'd up" when referring to work on a project that did not go as planned.

48.     Further emblematic of Mr. Murawski's openly racist attitudes and beliefs, the bumper sticker on the vehicle that Mr. Murawski drove to Momentum each day stated, in sum and substance, "This is OUR America – Get the Fuck Out!"  This hostile message specifically

targeted people of color, who are thought of within some circles of our population as un-American merely because they are not white.

49.     Mr. Murrell subsequently met with General Manager Jessica Adams, who oversaw all of Momentum's New York operations including the Field Installations Department within which both Mr. Murrell and Mr. Murawski were foremen, to report Mr. Murawski's racist comments.  Mr. Murawski happened to also be present.

50.     Mr. Murrell made it clear to Ms. Adams that he did not want to work in an environment in which white employees referred to Black employees in the manner Mr. Murawski had.

51.     Mr. Murawski actually admitted to using the term "Nigger" at work, and that he used that term multiple times.

52.     Despite the severity of what Mr. Murawski had done, Ms. Adams and Momentum failed to take any action against or discipline Mr. Murawski for his conduct.

53.     Later, an emboldened Mr. Murawski would joke to the white members of his crew by saying, "can you believe he [Mr. Murrell] thought he could make a complaint against me?"

**C.      Momentum Retaliates Against Mr. Murrell for Making Complaints About Racial Discrimination in the Workplace**

54.     Following his complaint, Momentum began a campaign of blatant and unlawful retaliation against Mr. Murrell in an apparent bid to force him to quit.

55.     For instance, Momentum denied Mr. Murrell a promotion he deserved in favor of a white, objectively lower performing and less qualified foreman named Frank Riva.

56.     Unlike Mr. Murrell, Mr. Riva did not have expertise in both installing solar panels and electrical work.

57.     Mr. Riva was, however, friends with Mr. Murawski, and began to scrutinize and unjustifiably criticize Mr. Murrell's work.  In fact, just days after his promotion, Mr. Riva threatened to split up Mr. Murrell's highly successful and efficient all-Black crew for no legitimate reason.

58.     Mr. Riva and other Momentum foremen and managers would even engage in racially hostile behavior through their group text chat (which included Mr. Murrell) by saying, "Make Momentum Great Again!," a referencing to the "Make America Great Again!" phrase which is regarded by many people as a phrase symbolizing racism and xenophobia.

59.     Mr. Murrell also once heard a white Service Department employee refer to his Black colored Chevrolet Suburban as his "Black Ho."

60.     Mr. Murrell immediately complained to Ms. Adams about Mr. Riva's threats to dismantle his team, which would detrimentally impact his performance.  However, his complaints fell on deaf ears.

61.     Mr. Murrell then brought his complaints to Ms. Adams's manager, James Pedi, who was based in Momentum's New Jersey headquarters.  After learning this, a furious Ms. Adams berated Mr. Murrell in front of Mr. Riva for having gone "over [her] head."

62.     Ms. Adams's and Mr. Pedi's lack of corrective action further emboldened Mr. Riva, who continued to show up at Mr. Murrell's job sites simply to criticize and belittle him and his team's work.  In contrast, when Mr. Riva visited job sites overseen by white foremen, he was jovial and would engage in friendly banter with the foremen and their crews.

63.     Upon information and belief, Mr. Riva has since been elevated to the position of General Manager/Installations Manager, a position he currently holds at Momentum.

64.     Days later, Mr. Murrell learned that Momentum was removing two of his strongest crew members, who were both Black, from his crew, and replacing them with two weaker-performing white employees.  No reason for this was provided.

65.     Mr. Murrell immediately complained to Ms. Adams about how he was being set up to fail, yet, Ms. Adams merely said, "well that's my decision, and it's final."

66.     Shockingly, within a week, Momentum stripped Mr. Murrell of his foreman title and changed it to lead electrician.  A less-qualified, white employee on Mr. Murrell's crew was promoted to foreman.  This was a humiliating, racially-motivated and retaliatory demotion.

67.     Soon thereafter, Mr. Murrell was assigned to be on the crew of a white foreman named Steven Viniotis.  Mr. Viniotis inexplicably refused to work with Mr. Murrell, and even grabbed and threw Mr. Murrell's tools and work clothes out of a truck they were in.  This was done in front of Ms. Adams's assistant, Vinny Goose, yet, nothing was done to address Mr. Viniotis's harassing, demeaning and racially-motivated behavior.

**D.     Mr. Murrell Is Fired in Retaliation For Continuing to Complain About Racial Discrimination in the Workplace**

68.     Realizing that there was no future for him at Momentum so long as he was in a business unit overseen by Ms. Adams such as the Field Installations Department, Mr. Murrell looked for other employment opportunities within the Company.

69.     Mr. Murrell spoke with Jason John, the manager of Momentum's Site Assessment Department which was based out of its New Jersey headquarters, about a possible transfer to his team.  Mr. John told Mr. Murrell that he would be glad to have "someone like [Mr. Murrell]" on his team so long as the transfer was approved by Mr. Murrell's manager, Ms. Adams.

70.     Soon thereafter, Mr. Murrell asked Ms. Adams to approve his transfer to the Site Assessment team.  However, Ms. Adams refused to approve the transfer, telling Mr. Murrell that

he did not deserve to remain at the Company, much less transfer to a different department, because he had complained about discrimination in the workplace.

71.     Notably, Mr. Murrell recorded this conversation with Ms. Adams, during which he explained:

> So, Jess, you're telling me I'm supposed to be comfortable, right. With you being comfortable with a foreman here calling black people niggers, and that's comfortable for you.   It's not comfortable for me.

72.     Ms. Adams noted that she had already spoken to Mr. Murrell about his prior complaint concerning the use of the "n-word."  When Mr. Murrell complained that no remedial action was actually taken, Ms. Adams said, "this conversation is over," "I'm calling James [Ms. Adams's supervisor] . . .   And we're going to make the decision [regarding the transfer]."  Ms. Adams then told Mr. Murrell that the transfer is "not going to happen."

73.     Ms. Adams also said that Mr. Murrell was supposed to have been "fired" the day that he initially complained about the use of the "n-word" (*i.e.*, that the company had decided to fire him for complaining), but that Ms. Adams "saved [his] job."

74.     Indeed, when Mr. Murrell pointed out that he had previously approached Ms. Adams about this racist comment, she responded:

> And I handled the situation.  **I almost fired you, I kept your job. That was a mistake right there.  That was my mistake because we're still here having this conversation.**

75.     Put another way, Ms. Adams admitted that, in retrospect, she should have just fired Mr. Murrell when he complained about the use of the "n-word" so that she would not have to hear him continue to complain about discrimination any longer.

76.    The very next day, November 20, 2018, Mr. Murrell was fired via a text message from Ms. Adams that stated that Momentum "decided to go in a different direction and [would] no longer need [his] services."

## II.    Tevin Brown

77.    Tevin Brown worked as an installer at Momentum in its Field Installation Department from May 2017 to February 2018.

78.    Mr. Brown routinely, on a near daily basis, heard vile, disgusting, racist words and comments in the workplace, such as "nigger," from multiple white employees, including from Mr. Murawski and a foreman named Tom.

79.    Mr. Brown would also hear, on a near daily basis, Mr. Murawski demeaningly refer to Black employees as "boy."

80.    Other white employees would regularly and gratuitously bring up Mr. Brown's race, apparently to remind Mr. Brown and other Black employees that they were "different" than the majority white workforce.

81.    For example, Mr. Riva once said to Mr. Brown, while they were out having a meal with other colleagues, "Oh – you [referring to Mr. Brown] don't want to eat, or you don't want to eat because you're Black?"

82.    Other white employees commonly made racist "jokes" and engaged in other racist innuendo, such as mocking the manner in which Jamaican employees spoke English, and questioning whether Black employees could "afford" to buy certain clothing, implying that Black persons are universally poorer than white persons.

83.    In addition, white employees would openly joke about how Black employees were paid less than white employees, which by then had become the worst kept secret at

Momentum.  Indeed, approximately one week before his sudden February 2018 termination at the hands of Defendant Silberman, Momentum hired a white individual with far less experience than Mr. Brown and paid him $22 an hour.  In contrast, Mr. Brown was earning just $15 an hour, despite having years of experience.  Following Mr. Brown's abrupt termination, this white employee replaced Mr. Brown.

84.  Notably the day after Mr. Brown complained to Mr. Murawski about how he did not like being called "boy," Mr. Brown was abruptly taken off of Mr. Murawski's crew and within weeks was fired.

85.  Notably, Mr. Silberman, who is half white and half Indian, was also part of the racist culture at Momentum, and would also use the word "nigger" at work, in addition to frequently using the term "nigga" on social media platforms like Facebook.

**III.  <u>Kenneth Sapp</u>**

86.  Kenneth Sapp worked at Momentum as an installer from September 2017 to his retaliatory discharge in May 2018.

87.  Mr. Sapp performed the majority of his work on projects based in New York City.

88.  Despite his strong performance, Mr. Sapp was paid less than his similarly-situated white peers.

89.  In or about March 2018, Mr. Sapp heard Mr. Murawski refer to a broken table as "nigger'd."

90.  At around this time, Mr. Sapp also heard Mr. Murawski refer to himself, another white employee, and Mr. Sapp as "two and a half people," a despicable allusion to the so-called "three-fifths compromise" between Southern and Northern states during the slavery era, which set the census value of a slave as 60 percent of the value of a free person.

91.    Within days, Mr. Sapp complained to Ms. Adams about Mr. Murawski's racist comments.  Ms. Adams promised to set up a meeting between her, Mr. Murawski and Mr. Sapp, but never followed through.

92.    Soon thereafter, Mr. Sapp was inexplicably transferred to Mr. Murrell's crew, which was notoriously assigned the most difficult jobs to complete, requiring longer workdays and added pressure to complete on time.

93.    However, Mr. Sapp was still assigned to help Mr. Murawski's crew from time to time, dispelling any notion that the transfer to Mr. Murrell's crew was done to avoid having Mr. Sapp and Mr. Murawski work together.

94.    Within weeks of his complaints to Ms. Adams about Mr. Murawski's conduct, Mr. Sapp's employment was abruptly terminated in retaliation for his protected activity.

## IV.    **Raoul Gerdes**

95.    Raoul Gerdes worked at Momentum as an installer from January 2018 until his discriminatory termination in or about April 2018, performing the majority of his work on job sites in New York City.

96.    Throughout his tenure, Mr. Gerdes regularly heard Momentum managers – white foremen and white Field Installation Department employees – use racist language.  This included comments by Mr. Murawski, Mr. Silberman and two foremen named Jeff and Tom referring to Mr. Gerdes' Field Installations crew, which was typically made up of Black employees, as "the nigga crew," as well as disparagingly calling Black employees "boy."

97.    Ms. Adams even insultingly referred to Mr. Gerdes as "poop eyes" to other managers and foremen at Momentum.

98.     Mr. Gerdes was highly experienced and a strong and dedicated worker, yet he was consistently paid significantly less than lesser-qualified white peers.

99.     For instance, while Mr. Gerdes earned about $16 an hour, less-experienced white workers were paid between $19 and $21 an hour at the start of their employments.

100.    Mr. Gerdes ultimately complained about this discriminatory pay discrepancy to Ms. Adams and to Mr. Silberman, and requested a raise.

101.    However, not only did Momentum refuse to entertain Mr. Gerdes's request to be compensated equally with white employees, but within weeks, Mr. Gerdes's employment was terminated by Mr. Silberman despite his unquestionably strong performance.

102.    Mr. Gerdes was replaced by a lesser-qualified white employee with no experience in the solar panel installation business.

## V.     **Chevon Riley**

103.    Chevon Riley worked as an installer at Solar Momentum from approximately August 2017 to February 2018, primarily on job sites situated within New York City.

104.    Mr. Riley routinely heard white employees, including managers, use racist words such as "nigger," as well as tell racist jokes.

105.    Mr. Riley also became aware that he and other Black employees were systematically paid significantly less than similarly-situated white employees.

106.    Mr. Riley complained to management, including to Ms. Adams, John Spawn, and Mr. Silberman, about the fact that less qualified white employees were being paid more than stronger performing Black employees.  However, Mr. Riley's complaints fell on deaf ears, as nothing was done to address this discriminatory pay disparity.

107.    Instead, within weeks, Mr. Riley's employment was terminated.

108.   At the time Mr. Riley's employment was terminated, he had just witnessed the Company terminate one Black employee each week for eight weeks straight.  Not a single white employee was terminated during this time period.

**VI.    Shaddon Beswick**

109.   Shaddon Beswick worked as an electrician and installer at Momentum between February 2017 and January 2018, primarily working on projects based in New York City.

110.   Despite being a strong and dedicated performer, Mr. Beswick was inexplicably paid less than his white peers.

111.   In late-September/early-October 2017, Mr. Murawski, who was a foreman and in a supervisory role, called Mr. Beswick a "boy" in an intimidating and derogatory manner.  When Mr. Beswick asked Mr. Murawski to not speak to him that way, Mr. Murawski responded, "I don't give a fuck about how a nigger thinks."

112.   The next day, Mr. Beswick complained to Ms. Adams about Mr. Murawski's behavior and requested that she take action to address his conduct.  Mr. Murawski was also present at this meeting.

113.   Ms. Adams made it clear that she had no intention of disciplining Mr. Murawski, and merely responded, "I do not have a comment – I wasn't there.  There are always three sides to a story – your side, his side, and the truth."

114.   Notably, throughout the meeting, Mr. Murawski's blatant disrespect towards Mr. Beswick and other Black employees was clear as he continuously laughed and made jokes.  In fact, Mr. Murawski was particularly amused and emboldened by the fact that Ms. Adams effectively ignored what Mr. Beswick had to say.

115.     At no point did Mr. Murawski deny any of Mr. Beswick's very serious allegations.

116.     A few days later, after seeing that no action had been taken against Mr. Murawski, Mr. Beswick again sought out Ms. Adams's help in addressing Mr. Murawski's actions.

117.     This time, when Mr. Beswick began speaking, Ms. Adams briefly looked up from her computer, peered in Mr. Beswick's general direction, failed to utter a word or otherwise acknowledge his presence and simply coldly returned to typing away on her laptop.

118.     Mr. Beswick was left to feel ignored and demoralized, as the manager whom he hoped would take action against a foreman who had called him "nigger" and "boy" at work made it readily clear that she had no interest in his well-being or that of other Black employees at Momentum Solar.

119.     The next day, Mr. Beswick arrived at work to learn that he was not assigned to work on any project that day.  Mr. Beswick went to speak with Ms. Adams, a manager named Chris and Mr. Murawski, and he was told that he was being terminated because "it just didn't work out."

120.     While Mr. Beswick was fired for making complaints of race discrimination, Mr. Murawski was retained and continued to spout vile racist language towards Black employees, including, as described above, towards Mr. Murrell, Mr. Brown and Mr. Sapp.

**VII.   <u>Wage and Hour Violations</u>**

121.     Plaintiffs and other similarly-situated Field Installations Department employees were subjected to a host of federal and state wage and hour violations which deprived them of their lawfully earned and entitled wages.

122.     For instance, Plaintiffs and other similarly-situated employees had to purchase the tools and other equipment that were required to perform their jobs, but were never reimbursed for these expenses.

123.     As a result, Plaintiffs and other similarly-situated employees had to expend up to thousands of dollars purchasing these tools and equipment, and, in some instances, had to purchase tools multiple times because they were lost or stolen.

124.     These tools included, but were not limited to: overalls, helmets, arc flash suits, insulated tools, including insulated and high powered screw drivers, high powered hammer drills and specially equipped drill bits, different types of hole saws, high powered impact drivers, asbestos masks, asbestos kits and safety masks.

125.     Momentum's failure to pay for or reimburse Plaintiffs and similarly-situated Field Installations Department employees for purchasing the tools of their trade and equipment is a violation of New York Labor Law § 193, which prohibits unlawful wage deductions of this nature.

126.     In addition, Momentum automatically deducts 30 minutes of compensable time each day, purportedly for a "break," from Plaintiffs and all similarly-situated employees in the Field Installations Department.  Yet, due to the incredibly demanding nature of their jobs, Plaintiffs and other similarly-situated employees rarely, if ever, have the opportunity to take a break, much less an uninterrupted 30-minute meal break during their workdays, and thus have to work "off-the-clock" during this time.

127.     As such, Momentum has been stealing and continues to steal 30 minutes of compensable time and wages from Plaintiffs and those similarly-situated.  This has resulted in

overtime violations under the FLSA and NYLL for workweeks in which the combined "on-the-clock" and "off-the-clock" hours are over 40, as well as straight-time violations under the NYLL.

128.     Furthermore, there was a several-months-long period in 2017 in which Momentum refused to pay Plaintiffs and other similarly-situated employees within the Field Installations Department for time spent traveling to and from job sites and Momentum's warehouse in Momentum vehicles.

129.     This unlawful practice resulted in substantial overtime and straight-time violations under the FLSA and NYLL.

130.     While Momentum eventually reversed its position and compensated employees for this travel time, it failed to pay back the wages it owed.

## CLASS ALLEGATIONS
### (§ 1981, THE NYSHRL AND THE NYCHRL)

**I.     Class Definition**

131.     This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a "Proposed Discrimination/Retaliation Class" of similarly-situated employees.  The Proposed Discrimination/Retaliation Class (subject to future revision as may be necessary), is defined as follows:

> **All Black Field Installation Department employees who worked for Momentum out of its New York warehouse during the full statutory period, including, but not limited to, installers, electricians, roof leads and foremen.**

132.     In order to be a member of the Proposed Discrimination/Retaliation Class, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed Discrimination/Retaliation Class Period").

133.    The unlawful conduct suffered by Plaintiffs and the members of the Proposed

Discrimination/Retaliation Class, includes, but is not limited to:

- Subjecting Plaintiffs and the Proposed Discrimination/Retaliation Class to repeated highly offensive and patently racist comments.

- Subjecting Plaintiffs and the Proposed Discrimination/Retaliation Class to other acts of racial hostility and discrimination, including, *inter alia*,

    o    demeaning, belittling and insulting Plaintiffs and the Proposed Discrimination/Retaliation Class;

    o    refusing to communicate with Plaintiffs and the Proposed Discrimination/Retaliation Class;

    o    ostracizing Plaintiffs and the Proposed Discrimination/Retaliation Class;

    o    assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to menial jobs while providing white employees with sophisticated work and opportunities for advancement; and

    o    assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to unfavorable job sites and work assignments.

- Failing to promote qualified members of the Proposed Discrimination/Retaliation Class, including Plaintiffs.

- Paying Plaintiffs and the Proposed Discrimination/Retaliation Class less than similarly-situated white employees.

- Failing to prevent, address, properly investigate and/or take remedial action regarding discrimination committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

- Retaliating against employees who report or complain about Defendants' discriminatory conduct, including, but not limited to, by terminating their employment.

134.    The Proposed Discrimination/Retaliation Class contains at least 40 members

during the applicable limitations period.

23

135.     Plaintiffs and the Proposed Discrimination/Retaliation Class have standing to seek the relief sought herein because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

136.     The patterns, practices and/or policies described in this Complaint demonstrate that discrimination and retaliation are not unusual at Momentum; rather, they are part and parcel to its standard operating patterns, practices and/or policies.

**II.     Numerosity and Impracticality of Joinder**

137.     The members of the Proposed Discrimination/Retaliation Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Discrimination/Retaliation Class members is unknown because such information is in the exclusive control of Momentum, upon information and belief there more than 40 current and former employees who have been victims of the discriminatory and retaliatory conduct and adverse employment actions described herein.

138.     Although precise determination of the number of Proposed Discrimination/Retaliation Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**III.     Common Questions of Law and Fact**

139.     The claims alleged on behalf of Plaintiffs and the Proposed Discrimination/Retaliation Class raise questions of law and fact common to all Plaintiffs and Proposed Discrimination/Retaliation Class members.  Chief among these questions are as follows:

- Whether Plaintiffs and the Proposed Discrimination/Retaliation Class were subjected to repeated and highly offensive and patently racist comments.

- Whether Plaintiffs and the Proposed Discrimination/Retaliation Class were subjected to other acts of racial hostility and discrimination, including, *inter alia*,

  o demeaning, belittling and insulting Plaintiffs and the Proposed Discrimination/Retaliation Class;

  o refusing to communicate with Plaintiffs and the Proposed Discrimination/Retaliation Class;

  o ostracizing Plaintiffs and the Proposed Discrimination/Retaliation Class;

  o assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to menial jobs while providing white employees with sophisticated work and opportunities for advancement; and

  o assigning Plaintiffs and the Proposed Discrimination/Retaliation Class to unfavorable job sites and work assignments.

- Whether Defendants failed to promote qualified members of the Proposed Discrimination/Retaliation Class, including Plaintiffs.

- Whether Defendants paid Plaintiffs and the Proposed Discrimination/Retaliation Class less than similarly-situated white employees.

- Whether Defendants failed to prevent, address, properly investigate and/or take remedial action regarding discrimination committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

- Whether Defendants retaliated against employees who report or complain about Defendants' discriminatory conduct, including, but not limited to, by terminating their employment.

140. Thus, the common question requirement of FRCP 23(a) is satisfied.

IV.    **Typicality of Claims and Relief Sought**

141.    Plaintiffs are members of the Proposed Discrimination/Retaliation Class they seek to represent.

142.    The claims of Plaintiffs are typical of the claims of the Proposed Discrimination/Retaliation Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal, state and local law.

143.    Plaintiffs and the members of the Proposed Discrimination/Retaliation Class all allege that they each were the victim of unlawful adverse employment decisions and/or a hostile work environment based on race and/or color and/or in retaliation for complaints regarding unlawful discrimination.

144.    The relief that Plaintiffs seek for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Discrimination/Retaliation Class.

145.    Thus, the typicality requirement of FRCP 23(a) is satisfied.

V.    **Adequacy of Representation**

146.    The interests of Plaintiffs are co-extensive with those of the Proposed Discrimination/Retaliation Class they seek to represent in the instant case.

147.    Plaintiffs are willing and able to represent the Proposed Discrimination/Retaliation Class fairly and vigorously as they pursue their similar individual claims.

148. Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

149. The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI. Requirements of Rule 23(b)

### A. Rule 23(b)(1)

150. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

151. Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.

152. Accordingly, certification of the Proposed Discrimination/Retaliation Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Discrimination/Retaliation Class and Defendants.

153. By filing this Complaint, Plaintiffs are preserving the rights of Proposed Discrimination/Retaliation Class members with respect to the statute of limitations on their claims. Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.      Rule 23(b)(2)

154.    Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Discrimination/Retaliation Class, by adopting and following systemic patterns, practices and/or policies that are discriminatory and retaliatory towards Plaintiffs and the members of the Proposed Discrimination/Retaliation Class.

155.    These discriminatory and retaliatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Discrimination/Retaliation Class as a whole.

156.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on Plaintiffs' and the members of the Proposed Discrimination/Retaliation Class' race and/or color and/or engagement in protected activity.

157.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Proposed Discrimination/Retaliation Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination and retaliation.

158.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

### C.      Rule 23(b)(3)

159.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Discrimination/Retaliation Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

160.     A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Discrimination/Retaliation Class.

161.     The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Discrimination/Retaliation Class to pursue their claims individually.

162.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Discrimination/Retaliation Class, as well as the common questions of law and fact described above.

## CLASS ALLEGATIONS
### (NYLL)

**I.     Class Definition**

163.     This is a class action pursuant to FRCP 23, brought by Plaintiffs on behalf of a "Proposed NYLL Class" of similarly-situated employees.  The Proposed NYLL Class (subject to future revision as may be necessary), is defined as follows:

> **All Field Installation Department employees who worked for Momentum out of its New York warehouse during the full statutory period, including, but not limited to, installers, electricians, roof leads and foremen.**

164.     In order to be a member of the Proposed NYLL Class, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed NYLL Class Period").

165.     The unlawful conduct suffered by Plaintiffs and the members of the Proposed NYLL Class, includes, but is not limited to:

- Automatically deducting 30 minutes of compensable time each day for a "break" that Plaintiffs and the Proposed NYLL Class rarely, if ever, have or had the opportunity to actually take, resulting in Defendants' failure to pay them for all hours worked each week, as well as Defendants' failure to pay them for all overtime hours worked during weeks in which Plaintiffs and the Proposed NYLL Class members worked more than 40 combined on-the-clock and off-the-clock hours.

- Failing to pay Plaintiffs and the Proposed NYLL Class wages for the time spent travelling to and from job sites and Momentum's New York warehouse in Momentum vehicles.

- Failing to pay for the tools and equipment that Plaintiffs and the Proposed NYLL Class were required and/or needed to have in order to perform their jobs, or to otherwise reimburse Plaintiffs and the Proposed NYLL Class for the cost of having to purchase such tools of the trade.

166.    The Proposed NYLL Class contains at least 100 members during the applicable limitations period.

167.    Plaintiffs and the Proposed NYLL Class have standing to seek the relief sought herein because of the adverse effects that Momentum's unlawful patterns, practices and/or policies have had on them individually and generally.

168.    The patterns, practices and/or policies described in this Complaint demonstrate that Momentum's violations of the NYLL are not sporadic or unusual; rather, they are part and parcel to its standard operating patterns, practices and/or policies.

II.    **Numerosity and Impracticality of Joinder**

169.    The members of the Proposed NYLL Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed NYLL Class members is unknown because such information is in the exclusive control of Momentum, upon information and belief there more than 100 current and former employees who have been the victim of Momentum's violations of the NYLL.

170.    Although precise determination of the number of Proposed NYLL Class members is impossible at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.    Common Questions of Law and Fact

171.    The claims alleged on behalf of Plaintiffs and the Proposed NYLL Class raise questions of law and fact common to all Plaintiffs and Proposed NYLL Class members.  Chief among these questions are as follows:

- Whether Momentum automatically deducted 30 minutes of compensable time each day for a "break" that Plaintiffs and the Proposed NYLL Class rarely, if ever, had the opportunity to actually take, including during weeks in which Plaintiffs and the Proposed NYLL Class members work more than 40 combined hours "on-the-clock" and "off-the-clock."

- Whether Momentum failed to pay Plaintiffs and the Proposed NYLL Class wages for the time spent travelling to and from job sites and Momentum's New York warehouse in Momentum vehicles.

- Whether Momentum failed to pay for the tools and equipment that Plaintiffs and the Proposed NYLL Class required in order to perform their jobs, or to otherwise reimburse Plaintiffs and the Proposed NYLL Class for the cost of having to purchase such tools and equipment.

172.    Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.    Typicality of Claims and Relief Sought

173.    Plaintiffs are members of the Proposed NYLL Class they seek to represent.

174.    The claims of Plaintiffs are typical of the claims of the Proposed NYLL Class in that they all arise from the same unlawful patterns, practices and/or policies of Momentum and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by state law.

175.     Plaintiffs and the members of the Proposed NYLL Class all allege that they each were the victim of violations of the NYLL, including a failure to pay overtime and straight-time, and violations of NYLL § 193 in connection with Momentum's failure to purchase or reimburse Plaintiffs and the Proposed NYLL Class for their purchase of the tools and equipment required to do their jobs.

176.     The relief that Plaintiffs seek for Momentum's unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed NYLL Class.

177.     Thus, the typicality requirement of FRCP 23(a) is satisfied.

**V.     Adequacy of Representation**

178.     The interests of Plaintiffs are co-extensive with those of the Proposed NYLL Class they seek to represent in the instant case.

179.     Plaintiffs are willing and able to represent the Proposed NYLL Class fairly and vigorously as they pursue their similar individual claims.

180.     Plaintiffs have retained counsel who are qualified and experienced in employment and wage and hour class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

181.     The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.     Requirements of Rule 23(b)

### A.     Rule 23(b)(1)

182.     Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

183.     Specifically, all evidence of Momentum's patterns, practices and/or policies, and the issue of whether it is in violation of federal, state and local law would be exchanged and litigated repeatedly.

184.     Accordingly, certification of the Proposed NYLL Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed NYLL Class and Momentum.

185.     By filing this Complaint, Plaintiffs are preserving the rights of Proposed NYLL Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

### B.     Rule 23(b)(2)

186.     Momentum has acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed NYLL Class, by adopting and following systemic patterns, practices and/or policies that violate the rights provided to Plaintiffs and the Proposed NYLL Class under the NYLL.

187.     These discriminatory and retaliatory acts are fostered by Momentum's standard patterns, practices and/or policies, are not sporadic or isolated and support the request for final

injunctive and declaratory relief with respect to Plaintiffs and the Proposed NYLL Class as a whole.

188.    Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on Plaintiffs' and the members of the Proposed NYLL Class' race and/or color and/or engagement in protected activity.

189.    Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Proposed NYLL Class' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination and retaliation.

190.    Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

**C.    Rule 23(b)(3)**

191.    The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed NYLL Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

192.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed NYLL Class.

193.    The cost of proving Momentum's pattern and practice of violating the NYLL makes it impracticable for the members of the Proposed NYLL Class to pursue their claims individually.

194.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed NYLL Class, as well as the common questions of law and fact described above.

## COLLECTIVE ACTION ALLEGATIONS
### (FLSA)

195.     Plaintiffs bring their FLSA claims as a collective action pursuant to the FLSA on behalf of themselves and on behalf of all other similarly-situated persons that fall within in the following definition:

> **All Field Installation Department employees who worked for Momentum out of its New York warehouse during the full statutory period, including, but not limited to, installers, electricians, roof leads and foremen.**

196.     In order to be a potential member of the Proposed FLSA Collective, an individual must have been or be included within the scope of the class definition at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Proposed FLSA Collective Period").

197.     At all relevant times, Plaintiffs and the members of the Proposed FLSA Collective were similarly-situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, plans and practices and were subject to Momentum's unlawful wage practices.

198.     During the Proposed FLSA Collective Period, Momentum was fully aware of the duties performed by Plaintiffs and the Proposed FLSA Collective, and that those duties were not exempt from the minimum overtime provisions of the FLSA.

199.    As a result of Momentum's conduct as alleged herein, Momentum violated 29

U.S.C. § 207 by not paying the appropriate overtime wages for all hours worked over 40 in a

workweek.

200.    Momentum's violations of the FLSA were willful, repeated, knowing, intentional

and without a good faith basis, and significantly damaged Plaintiffs and the Proposed FLSA

Collective.

201.    As a result of Momentum's conduct, Momentum is liable to Plaintiffs and the

Proposed FLSA Collective for the full amount of the overtime wages owed, plus an additional

equal amount as liquidated damages, plus the attorneys' fees and costs incurred by Plaintiffs and

the Proposed FLSA Collective.

202.    While the exact number of the Proposed FLSA Collective is unknown to Plaintiffs

at the present time, upon information and belief, there are at least 100 other similarly-situated

persons to Plaintiffs that constitute the Proposed FLSA Collective.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of § 1981)**
*Against all Defendants*

203.    Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation

Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set

forth herein.

204.    As described above, Defendants have discriminated against Plaintiffs and the

Proposed Discrimination/Retaliation Class on the basis of race and/or color in violation of

§ 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or

remedy a hostile work environment and disparate treatment, including with respect to pay and

other terms and conditions of employment, based on race and/or color.

205.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of § 1981, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

206.   Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of § 1981)**
***Against all Defendants***

207.   Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

208.   As described above, Defendants have retaliated against Plaintiffs and the Proposed Discrimination/Retaliation Class for engaging in protected activity, including, *inter alia*, by terminating their employment.

209.   As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of § 1981, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

210.   Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of § 1981 for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Discrimination in Violation of the NYSHRL)**
***Against all Defendants***

211.    Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

212.    As described above, Defendant Momentum has discriminated against Plaintiffs and the Proposed Discrimination/Retaliation Class on the basis of race and/or color in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment, including with respect to pay and other terms and conditions of employment, based on race and/or color.

213.    As described above, Defendants Adams, Silberman and Murawski aided and abetted the discriminatory conduct committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

214.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

### FOURTH CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
***Against all Defendants***

215.    Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

216.    As described above, Defendant Momentum has retaliated against Plaintiffs and the Proposed Discrimination/Retaliation Class for engaging in protected activity, including, *inter alia*, by terminating their employment.

217.    As described above, Defendants Adams, Silberman and Murawski aided and abetted the retaliatory conduct committed against Plaintiffs and the Proposed Discrimination/Retaliation Class.

218.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

**FIFTH CAUSE OF ACTION**
**(Discrimination in Violation of the NYCHRL)**
***Against all Defendants***

219.    Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

220.    As described above, Defendants have discriminated against Plaintiffs and the Proposed Discrimination/Retaliation Class on the basis of race and/or color in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment and disparate treatment, including with respect to pay and other terms and conditions of employment, based on race and/or color.

221.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiffs and the Proposed Discrimination/Retaliation Class have

suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

222.    Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

**SIXTH CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against all Defendants***

223.    Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

224.    As described above, Defendants have retaliated against Plaintiffs and the Proposed Discrimination/Retaliation Class for engaging in protected activity, including, *inter alia*, by terminating their employment.

225.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiffs and the Proposed Discrimination/Retaliation Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

226.    Defendants' unlawful retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiffs and the Proposed Discrimination/Retaliation Class are entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (NYLL Overtime Violations)
### *Against Defendant Momentum*

227.    Plaintiffs, on behalf of themselves and the Proposed NYLL Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

228.    Throughout the NYLL Class Period, Plaintiffs and the Proposed NYLL Class regularly worked and/or continue to work in excess of forty (40) hours per workweek.

229.    At all relevant times, Momentum operated under a decision, policy and plan, and under common policies, programs, practices, procedures, protocols, routines and rules of willfully failing and refusing to pay Plaintiffs and the Proposed NYLL Class at one and one half times their hourly wage for all work in excess of 40 hours per workweek by, *inter alia*, automatically deducting 30 minutes of compensable time each day for a "break" that Plaintiffs and the Proposed NYLL Class rarely, if ever, had the opportunity to actually take, during weeks in which Plaintiffs and the Proposed NYLL Class members worked 40 or more hours on-the-clock, and by not compensating Plaintiffs and the Proposed NYLL Class for time spent traveling to and from job sites and Momentum's New York warehouse in Momentum vehicles.

230.    At all relevant times, Momentum willfully, regularly and repeatedly failed to pay Plaintiffs and the Proposed NYLL Class at the required overtime rate, which is one and one half times their hourly wage, for all hours worked in excess of 40 hours per workweek.

231.    Due to Momentum's NYLL violations, Plaintiffs and the Proposed NYLL Class are entitled to recover from Momentum damages in the amount of their respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs and interest.

**EIGHTH CAUSE OF ACTION**
**(NYLL § 193 Violations)**
*Against Defendant Momentum*

232.    Plaintiffs, on behalf of themselves and the Proposed NYLL Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

233.    Throughout the NYLL Class Period, Momentum failed to pay for the tools that Plaintiffs and the Proposed NYLL Class required in order to perform their jobs, or to otherwise reimburse Plaintiffs and the Proposed NYLL Class for the cost of such tools.  Such conduct was carried out in violation of NYLL § 193.

234.    Due to Momentum's NYLL § 193 violations, Plaintiffs and the Proposed NYLL Class are entitled to recover from Momentum damages in the amount that they spent on the tools required in order to perform their jobs, liquidated damages, attorneys' fees and costs and interest.

**NINTH CAUSE OF ACTION**
**(Failure to Pay Wages for All Hours Worked in Violation of NYLL §191)**
*Against Defendant Momentum*

235.    Plaintiffs, on behalf of themselves and the Proposed NYLL Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

236.    The NYLL requires covered employers, such as Momentum, to pay employees for all hours worked.  Plaintiffs and the Proposed NYLL Class were not exempt from the requirement that Momentum pay them for all hours worked under the NYLL.

237.    However, based on the reasons set forth herein, Defendants did not always pay Plaintiffs and the Proposed NYLL Class their straight-time wages for all hours worked, causing Plaintiffs and the Proposed NYLL Class to perform a substantial amount of off-the-clock work.

238.    As a result of Momentum's failure to pay Plaintiffs and the Proposed NYLL Class their straight-time wages for all hours worked, Momentum violated the NYLL.

239.    Momentum's violations of the NYLL have significantly damaged Plaintiffs and the Proposed NYLL Class and entitle them to recover the total amount of their unpaid straight-time wages, an additional amount in liquidated damages and attorneys' fees and costs, and interest.

### TENTH CAUSE OF ACTION
**(FLSA Overtime Violations)**
*Against Defendant Momentum*

240.    Plaintiffs, on behalf of themselves and the Proposed FLSA Collective, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

241.    Throughout the FLSA Collective Period, Plaintiffs and the Proposed FLSA Collective regularly worked and/or continue to work in excess of forty (40) hours per workweek.

242.    At all relevant times, Momentum operated under a decision, policy and plan, and under common policies, programs, practices, procedures, protocols, routines and rules of willfully failing and refusing to pay Plaintiffs and the Proposed FLSA Collective at one and one half times their hourly wage for all work in excess of 40 hours per workweek by, *inter alia*, automatically deducting 30 minutes of compensable time each day for a "break" that Plaintiffs and the Proposed FLSA Collective rarely, if ever, had the opportunity to actually take, during weeks in which Plaintiffs and the Proposed FLSA Collective members worked 40 or more hours on-the-clock, and by not compensating Plaintiffs and the Proposed FLSA Collective for time spent traveling to and from job sites and Momentum's New York warehouse in Momentum vehicles.

243.    At all relevant times, Momentum willfully, regularly and repeatedly failed to pay Plaintiffs and the Proposed FLSA Collective at the required overtime rate, which is one and one half times their hourly wage, for all hours worked in excess of 40 hours per workweek.

244.     Due to Momentum's FLSA violations, Plaintiffs and the Proposed FLSA Collective are entitled to recover from Momentum damages in the amount of their respective unpaid overtime compensation, liquidated damages, attorneys' fees and costs and interest.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Proposed Discrimination/Retaliation Class, the Proposed NYLL Class and the Proposed FLSA Collective, pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.     Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed Discrimination/Retaliation Class;

B.     Designation of Plaintiffs as representatives of the Proposed Discrimination/Retaliation Class;

C.     Designation of Plaintiffs' counsel of record as class counsel for the Proposed Discrimination/Retaliation Class;

D.     Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed NYLL Class;

E.     Designation of Plaintiffs as representatives of the Proposed NYLL Class;

F.     Designation of Plaintiffs' counsel of record as class counsel for the Proposed NYLL Class;

G.     Designation of this action maintainable as a collective action pursuant to 29 U.S.C. § 216;

H.     Designation of Plaintiffs as representatives of the Proposed FLSA Collective;

I.      Designation of Plaintiffs' counsel of record as class counsel for the Proposed

FLSA Collective;

J.      A declaratory judgment that the actions, conduct and practices of Defendants

complained of herein violate the laws of the United States, the State of New York and the City of

New York;

K.      An injunction and order permanently restraining Defendants and their partners,

officers, owners, agents, successors, employees and/or representatives, and any and all persons

acting in concert with them, from engaging in any such further unlawful conduct, including the

policies and practices complained of herein;

L.      An order directing Defendants to take such affirmative action as is necessary to

ensure that the effects of these unlawful employment practices are eliminated and do not

continue to affect the lives of Plaintiffs and the Proposed Discrimination/Retaliation Class, the

Proposed NYLL Class and the Proposed FLSA Collective;

M.      An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiffs and the Proposed Discrimination/Retaliation Class, the Proposed NYLL Class and the

Proposed FLSA Collective for all monetary and/or economic damages;

N.      An award of damages against Defendants, or any jointly or severally liable entity

or person, in an amount to be determined at trial, plus prejudgment interest, to compensate

Plaintiffs and the Proposed Discrimination/Retaliation Class, the Proposed NYLL Class and the

Proposed FLSA Collective for all non-monetary and/or compensatory damages;

O.      An award of liquidated damages;

P.      An award of punitive damages;

Q.      Pre- and post-judgment interest on all amounts due;

R.      An award of costs that Plaintiffs and the Proposed Discrimination/Retaliation

Class, the Proposed NYLL Class and the Proposed FLSA Collective incur in this action, as well

as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

S.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of fact and damages.

Dated: May 6, 2019
          New York, New York                         Respectfully Submitted,

                                                     **WIGDOR LLP**

                                                     By: _____
                                                          Michael J. Willemin
                                                          Tanvir H. Rahman

                                                     85 Fifth Avenue
                                                     New York, New York 10003
                                                     Telephone:  (212) 257-6800
                                                     Facsimile:   (212) 257-6845
                                                     mwillemin@wigdorlaw.com
                                                     trahman@wigdorlaw.com

                                                     *Counsel for Plaintiffs and Proposed Counsel
                                                     for the Proposed Discrimination/Retaliation
                                                     Class, the Proposed NYLL Class and the
                                                     Proposed FLSA Collective*